# Exercise of Transfer Authority Under § 110 of H.J. Res. 370

The substantive authority granted the Secretary of the Treasury by H.J. Res. 370 to transfer funds between appropriation accounts is severable from the unconstitutional "committee approval" provision in that law, and may be exercised by the Secretary within a reasonable period after he has informed the Appropriations Committee of his intent to do so.

September 2, 1982

## MEMORANDUM FOR THE GENERAL COUNSEL,
## DEPARTMENT OF THE TREASURY

This responds to your request for our opinion whether a "committee approval" provision contained in § 110 of Pub. L. No. 97-92, 95 Stat. 1183, 1194 (1981), is severable from the substantive authority granted in § 110 to the Secretary of the Treasury to transfer funds between appropriation accounts. For reasons stated hereafter, we believe that this substantive transfer authority is severable from the unconstitutional "committee approval" provision. It follows from this conclusion that the substantive transfer authority may be exercised notwithstanding the unconstitutionality of the "committee approval" provision. Thus, the "approval" of the committee is not, in our view, required in order for the Secretary to exercise the transfer authority; that power may be exercised after appropriate notice to the Appropriations Committees has, in the judgment of the Secretary, been given.

Section 110 was enacted as part of H.J. Res. 370, a joint resolution making continuing appropriations for many federal departments and agencies that was enacted on December 15, 1981. Section 110 reads, in pertinent part, as follows:

> [T]he Secretary of the Treasury is authorized to transfer up to 2 per centum from any appropriation account provided by this joint resolution for the Department of the Treasury . . . to any other such appropriation account: . . . *Provided further,* That approval for such transfers is obtained in advance from the House and Senate Committees on Appropriations.

95 Stat. 1194. You have informed us that the Secretary of the Treasury, earlier this year, exercised the transfer authority granted by § 110, with the "approval" of the House and Senate Committees on Appropriations. In addition, the Secretary has, by letters to the Committee chairmen of August 27, 1982, informed those

Committees of his intent to exercise his power under § 110 to make certain transfers, indicating in his letters the need to do so by September 2 in order to continue certain activities in the Internal Revenue Service and the United States Secret Service.[1] The Secretary has, to date, received no response from either of the Committees. The general question presented is whether he may execute the transfers in question, which we assume to be otherwise within the substantive authority granted by § 110, without having secured "in advance" the "approval" of the Committees.

We believe the threshold question which must be addressed is whether the substantive authority granted in § 110 is severable from the "committee approval" provision. As you are aware, the Executive has long regarded these kinds of "committee approval" provisions as unconstitutional. See, e.g., 37 Op. Att'y Gen. 56 (1933); 41 Op. Att'y Gen. 230 (1955); 41 Op. Att'y Gen. 300 (1957). Indeed, Presidents Eisenhower and Johnson explicitly instructed their subordinates to disregard such "committee approval" provisions in signing into law bills that contained such provisions. See Public Papers of the Presidents, Dwight D. Eisenhower 688, 689 (1955); Public Papers of the Presidents, Lyndon B. Johnson 104–05 (1963–64).

If, however, the "committee approval" provision is not severable from the substantive authority to which it is attached, here the transfer authority, then the transfer authority itself may not be exercised by the Secretary. Because the Secretary has previously exercised his authority under § 110, this Administration has, at least implicitly, taken the position that the "committee approval" provision is severable from the Secretary's substantive authority because if we believed the provision were inseverable, then it is doubtful that the Secretary could exercise the substantive transfer authority. We believe that position is correct.

The courts will generally presume that Congress intends the unconstitutional portion of a statute to be severed from the remainder of that statute. See Tilton v. Richardson, 403 U.S. 672, 684 (1971) (plurality opinion), quoting NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 30 (1937) (" 'The cardinal principal of statutory construction is to save and not to destroy.' "). Under the law of severability, the invalid portions of a statute are to be severed " '[u]nless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not . . . .' " Buckley v. Valeo, 424 U.S. 1, 108 (1976), quoting Champlin Refining Co. v. Corporation Commission, 286 U.S. 210, 234 (1932).

We believe the presumption of severability governs the "committee approval" provision in § 110 for several reasons. First, we have found no indication in the sparse legislative history of the joint resolution that Congress ever focused on the question whether, assuming the unconstitutionality of the "committee approval" provision, it would refuse to extend to the Secretary the substantive authority contained in § 110. Indeed, we have been unable to find any pertinent reference

[1] According to Acting Secretary Sprinkel's letter, appropriation accounts for these activities will be exhausted on or about September 2, 1982.

521

whatsoever to § 110 in that legislative history. *See* H.R. Rep. 372, 97th Cong., 1st Sess. (1981); 127 Cong. Rec. S 14956–96 (daily ed. December 10, 1981); *id.,* H 9102–55. Second, although the literal language of § 110 *assumes* that the Secretary will have received the "approval" of the Committees before he exercises the transfer authority, we would not read that language as decisive of the severability issue. We would not do so for two separate but related reasons.

First, Congress concededly assumes the constitutionality of such legislative veto provisions when it includes them in bills. Thus, there is no reason to believe that such an assumption reflects a congressional determination that it would not have granted the substantive authority if the legislative veto provision is indeed unconstitutional. To attribute to Congress such an intent would be to attribute to Congress the intent to enact meaningless legislation, because Congress includes such provisions knowing full well the position of the Executive that such provisions are unconstitutional and at least constructively being on notice that extant court decisions, including a decision of the Ninth Circuit decided almost a year before H.J. Res. 370 was enacted, indicate the correctness of the Executive's position.[2]

Second, and more importantly, there is a long and continuous practice of the Executive's refusing to regard identical or similar language contained in appropriations acts as being determinative of the severability issue. Indeed, this longstanding view of the Executive, well known to Congress, records the Executive as opposing such "committee approval" provisions on constitutional grounds and as asserting the right to exercise the substantive power attached to those provisions without first receiving the "approval" of the Appropriations Committees.

Thus, in 1955, President Eisenhower, in signing into law the Department of Defense Appropriation Act, noted that a section of that Act prohibited use of funds appropriated under it for certain purposes without the approval of the Appropriations Committees of the Senate and House. In a signing statement addressed to Congress, President Eisenhower stated to Congress that the legislative veto aspect of that provision "will be regarded as invalid by the executive branch of the Government . . . ." Public Papers of the Presidents, Dwight D. Eisenhower 688, 689 (1955).

In 1963, President Johnson signed into law the Public Works Appropriations Act. That Act contained a provision preventing the Panama Canal Company from disposing of any real property without first obtaining the approval of the appropriate legislative committees of the House and Senate. In a signing statement, President Johnson stated his view that such "committee approval" provisions were unconstitutional and he stated that the provision was to be treated as "a request for information . . . ." Public Papers of the Presidents, Lyndon B.

---

[2] *Chadha* v. *INS,* 634 F 2d 408 (9th Cir. 1980), Nos. 80–1832 (1983) Shortly after enactment of H.J. Res 370, a decision was handed down by the D C. Circuit in *Consumer Energy Council of America* v. *FERC,* 673 F 2d 425 (1981), a case currently pending on appeal to the Supreme Court, in which that court broadly condemned all types of legislative veto devices as unconstitutional. Both Houses of Congress participated actively in the litigation of that case as well as *Chadha* and were thoroughly apprised of the Executive's position on the constitutional issue involved.

Johnson 104 (1963–64). President Johnson by separate memorandum directed the Secretary of the Army, entrusted with execution of that provision of the Public Works Appropriations Act, to exercise authority under the Act but to regard the "committee approval" provision as merely requiring the Secretary to keep the congressional committees informed of actions taken under the substantive authority of that Act.

More recently, President Carter signed into law the Foreign Assistance and Related Programs Appropriations Acts of 1977 and 1978 which contained "committee approval" provisions attached to transfer authority virtually identical to the "committee approval" provision in § 110. At the time he signed those bills into law, President Carter directed the Secretary of State by memorandum to regard the "committee approval" aspects as unconstitutional and, therefore, not legally binding. He directed the Secretary to treat the "committee approval" provision as requiring only that the appropriate committees be consulted. Subsequently, as detailed in a letter from the General Counsel of the Agency for International Development to Chairman Inouye of the Subcommittee on Foreign Operations of the Senate Committee on Appropriations of February 12, 1980, the President exercised the transfer authority contained in § 115 without securing in advance the "approval" of the Appropriations Committees. In doing so, the President acted on the advice of this Office, provided to the Director of the Office of Management and Budget on October 28, 1977, that the authority under § 115 could be exercised without the prior approval of the Appropriations Committees.[3]

We believe these historical incidents establish a consistent view of the Executive with regard to "committee approval" provisions in appropriations acts that substantive authority to which such "committee approval" provisions are attached will be exercised and that the "committee approval" provisions will be treated essentially as requiring only that the committees be informed of action taken or to be taken by the Executive. We have no difficulty in concluding that the language of § 110, without more, cannot be read as expressing a congressional intent to overturn this established understanding. In a similar vein, we do not believe that that plain language can, in this overall historical context, be regarded as expressing a congressional intent that the substantive authority granted by § 110 should fall with the "committee approval" provision—in short, the "committee approval" provision is, in our view, severable.

Based on this same historical practice, we believe the Secretary is entitled to exercise his transfer authority under § 110 within a reasonable period of time after he has informed the Appropriations Committees of his intent to do so. In present circumstances, we believe the Secretary could conclude that the August 27, 1982, letters to the Appropriations Committees chairmen regarding

---

[3] We note that shortly after this full airing of the Executive's position that such authority could be exercised without the prior approval of the Appropriations Committees, those same Committees acted on the Foreign Assistance and Related Program Appropriations Act, Pub. L. No. 97–121, 95 Stat. 1647 (1982). In that Act, the Committees and Congress left intact the transfer authority which had been the subject of contention in 1980. *See* § 514, 95 Stat. 1655, and § 523, 95 Stat. 1657 (1982)

transfers currently under consideration provide reasonable notice and that the Secretary may execute such transfers as he determines to be appropriate.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*